# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

United States District Court
Southern District of Texas
**FILED**

MAY 0 8 2013

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **vs.** | § | **CRIMINAL NO. H-11-030-S2** |
| | § | |
| | § | |
| **HOSSEIN LAHIJI, M.D.** | § | |
| | § | |
| **and** | § | |
| | § | |
| **NAJMEH VAHID LAHIJI,** | § | |
| **A.K.A. NAJMEH VAHID-DASTJERDI,** | § | |
| **Defendants** | § | |

## THIRD SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

### COUNT ONE
### (Conspiracy - 18 U.S.C. § 1349, § 1347 and §2 )

**A.**  **INTRODUCTION**

At all times material to this indictment:

1.  The **Defendants Hossein Lahiji, M.D.** and **Najmeh Vahid Lahiji, A.K.A. Najmeh Vahid-Dastjerdi,** owned, operated and were employed at Lahiji Urology Centers, PA (hereinafter referred to as "LUC"), located at Nolana Professional Center, 801 E. Nolana, STE 20 in McAllen, Texas from June 2002 until the present time.  Prior to June 2002, LUC was located at Medical Arts Building, 1315 E. 6th Street, Suite 1, Weslaco, Texas.

2.  On December 8, 1995, the Texas Medical Board issued **Defendant Hossein Lahiji, M.D.** a license to practice medicine in the State of Texas.

3.  In 1995, **Defendant Hossein Lahiji, M.D.** submitted a Medicare/Federal Health Care Provider/Supplier Enrollment Application.

4.      **Defendant Hossein Lahiji, M.D.** was issued Medicare provider number 00T85N that was made retroactive to August 25, 1995.

5.      On October 1, 2002, **Defendant Hossein Lahiji, M.D.** was issued Medicare group provider number 00736U.

6.      On September 8, 1995, **Defendant Hossein Lahiji, M.D.** submitted a Texas Medicaid Provider Enrollment Application.

7.      On November 3, 1995, **Defendant Hossein Lahiji, M.D.** was approved to be a provider for the Texas Medicaid Program and assigned Provider ID P000T85N4.

8.      On February 5, 1999, **Defendant Hossein Lahiji, M.D.** submitted the required Texas Medicaid Provider Re-enrollment Application and was assigned Provider ID 1002123.

9.      From as early as December 1, 2002 through at least February 24, 2011, **Defendant Najmeh Vahid Lahiji** worked as the office administrator LUC.  During this time, **Defendant Najmeh Vahid Lahiji** was a joint account holder with **Defendant Hossein Lahiji, M.D.** on all bank accounts affiliated with the business LUC and all personal accounts of the Lahijis.

10.     On April 11, 2003, **Defendant Hossein Lahiji, M.D.** submitted a Texas Medicaid Group Provider Enrollment Application in the name of LUC, PA.

11.     On May 23, 2003, LUC, PA was approved as a group provider for the Texas Medicaid Program and assigned Provider ID 1570533.

12.     From August 2007 through May 2010, **Defendant Najmeh Vahid Lahiji** attended law school at St. Mary's School of Law in San Antonio, Texas. **Defendant Najmeh Vahid Lahiji** is licensed in the State of Texas to practice law since November 5, 2010 under the name "**Najmeh Vahid-Dastjerdi**".

2

13.     From approximately January 1, 2003 through February 24, 2011, **Defendants Hossein Lahiji, M.D., Najmeh Vahid Lahiji**, and other employees of the LUC, both known and unknown to the Grand Jury, fraudulently billed Medicare and Medicaid for evaluations and physician urology services claimed to have been performed by **Defendant Hossein Lahiji, M.D.**, when they were not.

<u>SECRETARY OF HEALTH AND HUMAN SERVICES</u>

14.     Since at least April 18, 1994, the Secretary of Health and Human Services has designated Hidalgo County as a Medically Underserved Area/Population (MUA/P) under the authority provided by 42 C.F.R. Chapter 1, Subchapter A, Part 5, Section 5.3 and 42 C.F.R. Chapter 6A, Subchapter II, Part D, Subpart ii, Section 254 E.

<u>THE MEDICARE PROGRAM</u>

15.     The Medicare program is a federally funded health insurance program that provides health care benefits to any person 65 years of age or older, and to certain disabled individuals (also known as "beneficiaries").

16.     Medicare is administered by the United States Department of Health and Human Services (hereinafter referred to as "HHS").  The agency within HHS responsible for the oversight of Medicare is the Centers for Medicare and Medicaid Services (hereinafter referred to as "CMS"), formerly known as the Health Care Financing Administration ("HCFA").

17.     Medicare primarily consists of two parts.  Medicare Part A pays for services provided by institutional providers such as hospitals and skilled nursing facilities.  Medicare Part B pays for certain outpatient services, equipment and physician services, including urology services provided by a licensed physician.

3

18.     CMS contracts with private contractors, typically insurance companies, to administer Medicare, that is, to receive, process, and pay claims. A contractor who administers Part B of Medicare is known as a "carrier".

19.     In Texas, the Medicare Part B carrier was TrailBlazer Health Enterprises, LLC (hereinafter referred to as "TrailBlazer") located in Dallas, Texas.

20.     Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

THE TEXAS MEDICAID PROGRAM

21.     The Texas Medicaid Program is a state administered health insurance program that provides health care services to the poor. Each individual state designs and administers its own Medicaid program, subject to the requirements mandated by CMS. The Texas Medical Assistance (Medicaid) Program was implemented on September 1, 1967, under the provisions of Title XIX of the federal *Social Security Act* and Chapter 32 of the *Texas Human Resources Code*. The Health and Human Services Commission (HHSC) is the single state Medicaid agency responsible for the Title XIX Program. The State of Texas and the federal government share the cost of funding Texas Medicaid. The program is jointly funded by the federal government as long as the state's program complies with CMS's requirements. Examples of covered services include inpatient hospital care, skilled to intermediate nursing home care, and professional services provided by physicians, dentists, laboratories, and suppliers.

22.     Until December 31, 2003, the State of Texas contracted with the National Heritage Insurance Company (hereinafter referred to as "NHIC") to process and pay Medicaid claims submitted by health care providers.

4

23.    From January 1, 2004 until February 24, 2011, the State of Texas contracted with the Texas Medicaid and Healthcare Partnership ("TMHP") to process and pay Medicaid claims submitted by health care providers.

24.    Health care providers submit bills for services rendered to the Texas Medicaid Program by and through TMHP (formally NHIC) for processing and payment. A licensed health care provider may enter into an agreement with TMHP allowing for the automatic submission of claims via electronic media, and for payments to be directly deposited into the provider's designated bank or checking account or simply receive a paper check in the mail.

25.    Medicaid is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

OTHER "HEALTH CARE BENEFIT" PROGRAMS

26.    In addition to Medicare and Medicaid, the defendants did fraudulently bill the following private health insurance companies: Aetna, Blue Cross Blue Shield, Humana, and United Healthcare. All of these health insurance companies are "health care benefit programs" as defined in 18 U.S.C. § 24(b).

THE MEDICAL BILLING PROCESS

27.    Medical providers and health care benefit programs use well-known and standard insurance processing codes to identify certain medical diagnoses and medical treatments or procedures. The codes for medical services and procedures are called Current Procedure Terminology "CPT" Codes.

28.    CPT codes are used to bill for any time the physician spent with a patient. In general, CPT codes cover a specific procedure performed or medical time spent with a patient for "evaluation and management" of the patient. Evaluation and Management "E/M" services are

5

divided into broad categories, such as office visits, hospital visits, and consultations. An "office visit" is a type of service provided when a medical professional spends time with a patient on an outpatient basis. A "consultation" is a type of service provided by a physician whose opinion or advice regarding the evaluation and/or management of a specific problem is requested by another physician or medical professional.

29.     The CPT codes distinguish among different types of services and each type of service has its own codes for billing. The CPT codes for "consultations" are different from the CPT codes for the "office visits." The CPT codes recognize different levels of complexity within each category. The CPT codes also distinguish between new and established patients.

30.     Using the CPT codes, Medicare, Medicaid and private health insurance companies reimburse different types of office visits and different types of consultations at different rates. In general, a consultation enables a physician to bill a more expensive claim to the health care benefit programs compared to an office visit. In general, a consultation requires a more extensive history and examination, and a higher degree of medical decision making than an office visit.

## HEALTH CARE BENEFIT PROGRAMS COVERAGE FOR PHYSICIAN SERVICES

31.     Physician services include those  reasonable and medically necessary services ordered and performed by a physician or under a physician's personal supervision that are within the scope of the practice of his or her profession as defined by state law. For each encounter, a physician must examine the patient; confirm or revise the diagnosis of record; determine treatment; confirm or revise the plan of care; and document those tasks in the appropriate medical records for the client before submitting claims.

32.     Medicare provides for payment for "incident to" services. "Incident to" services are defined as services or supplies that are furnished as an integral, although incidental, part of the physician's personal professional services in the course of diagnosis or treatment of an injury or illness. Coverage for these "incident to" services for physicians in private practice is limited to situations in which there is direct physician supervision of auxiliary personnel. Medicare defines "direct supervision" as while the physician does not need to be present in the same room with their auxiliary personnel, they must be present in the same office suite and immediately be available to provide assistance and direction throughout the time the personnel is performing services.

33.     Medicare defines "auxiliary personnel" to include certain non-physician practitioners or "NNP's", who are being licensed by the states under various programs to assist or act in the place of a physician to include, for example, certified nurse midwives, clinical psychologists, clinical social workers, physician assistants (PA's), nurse practitioners (NP's), and Certified Nurse Specialists (CNS's). However, for services of an NNP to be covered by Medicare as "incident to" services of a physician, the services must meet all the coverage requirements specified within the "incident to" criteria and those services must be performed under the physician's direct supervision.

34.     Supervision by a physician is defined by Medicaid as either personal or direct. Personal supervision means that the supervising physician must be in the building of the office or facility when and where the service is provided. For direct supervision, the physician must be physically present in the room at the time the service is provided. Specific procedures codes call for a specific types of supervision.

7

35.      Consistent with the general principles of medical record documentation, a provider physician is required to completely document the patient's physical symptoms, diagnosis and treatment, and to include the patient's condition that justifies the services performed and billed to Medicare, Medicaid and private insurance companies.

## STATE OF TEXAS, THE TEXAS MEDICAL BOARD,& MEDICAL ASSISTANTS

36.      Medical Assistants (MA's) are not licensed, certified, or registered by any agency of the State of Texas, nor are they recognized under federal Medicare or Medicaid laws as a species of "provider." There is no reference to MA's in the Medical Practice Act or any other Texas statute. A MA does not meet the criteria for NNP's or auxiliary personnel.

37.      The Medical Practice Act (MPA) establishes the general parameters for physician delegation in Texas. The MPA authorizes physicians to delegate any medical act that a reasonable and prudent physician would find within the scope of sound medical judgment to delegate. Acts delegated "must comply with other applicable laws." The delegated acts must be performed by qualified persons, and each of the conditions specified at section 157.001 of the Texas Occupations Code must be met.

38.      The Scope of Standing Delegation Orders is defined by Title 22 Tex. Admin. Code Part 9, Section 193.4. Standing delegation orders may be authorized for the performance of acts and duties which do not require the exercise of independent medical judgment. In paragraphs (1) - (8) of Title 22 Tex. Admin. Code Part 9, Section 193.4, the specific limitations on the physician's use of standing delegation orders are listed and explained.

39.      Under Section 157.052 of the Texas Occupations Code, Prescribing at Sites Serving Certain Medically Underserved Populations, a Physician may delegate to either an Advance Practice Nurse (APN)/Nurse Practitioner or a Physician Assistant (PA) the act of

8

administering, providing or carrying out, or signing a prescription drug order, as authorized by

the physician through a physician's order, a standing medical order, a standing delegation order,

or another order or protocol as defined by the medical board.  There is no federal law or state law

in Texas that permits a licensed physician to delegate prescribing to MA's.

**B.**     **THE CONSPIRACY**

40.     Beginning on or about January 1, 2003 and continuing thereafter until on or about

February 24, 2011 in the Southern District of Texas, and within the jurisdiction of the Court,

defendants,

**HOSSEIN LAHIJI, M.D.**
**and**
**NAJMEH VAHID LAHIJI,**

did knowingly conspire and agree together and with other persons known and unknown to the

Grand Jury to commit an offense against the United States, that is, to knowingly and willfully

execute and attempt to execute a scheme and artifice:

     i.      to defraud a health care benefit programs, that is, Medicare, Medicaid, Aetna,
Blue Cross Blue Shield, Humana, and United Healthcare.

     ii.      to obtain, by means of false and fraudulent pretenses, representations, and
promises, any of the money and property owned by, and under the custody and
control of a health care benefit programs, that is, Medicare, Medicaid, Aetna, Blue
Cross Blue Shield, Humana, and United Healthcare;

in connection with the delivery of and payment for health care benefits, items and services,

namely, physician urology services in violation of Title 18, United States Code, Section 1347

(health care fraud).

**C.**     **MANNER AND MEANS OF THE CONSPIRACY**

9

41.     It was the part of the scheme and artifice to fraudulently obtain money from the health care benefit programs by billing these programs for physician urology services that were:

> 1) not covered by Medicare, Medicaid, Aetna, Blue Cross Blue Shield, Humana, and United Healthcare;
>
> 2) not ordered by a physician;
>
> 3) not provided by qualified persons; and/or
>
> 4) not provided at all.

42.     It was a part of the scheme and artifice to defraud that **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji**, submitted claims to these health care benefit programs which were false or fraudulent in numerous ways including the following:

> a.  claimed services using a false diagnosis;
>
> b.  claimed services not performed;
>
> c.  claimed services not ordered by a physician;
>
> d.  claimed evaluations not performed by a physician; and
>
> e.  claimed services provided by unqualified persons.

### *Traveling Outside of the United States*

43.     It was a part of the scheme and artifice to defraud that **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji**, knowingly billed these health care benefit programs for patients that **Defendant Hossein Lahiji, M.D.** supposedly treated on days when he was absent from the office and traveling outside of the United States as indicated in the table below during which there was never any coverage by a physician partner, resident, substitute physician or "*locum tenens*" from 2003 until 2011:

10

| Dates of Travel | Destination from the United States | Traveler |
|---|---|---|
| 1/17/2003-1/26/2003 | Tehran, Iran | Hossein Lahiji, MD. |
| 11/12/2003-11/17/2003 | Tehran, Iran | Hossein Lahiji, M.D. |
| 9/13/2004-9/28/2004 | Tehran, Iran | Hossein Lahiji, M.D. |
| 1/29/2005-2/10/2005 | Tehran, Iran | Hossein Lahiji, M.D. |
| 12/30/2005-1/19/2006 | Jeddah, Saudi Arabia | Hossein Lahiji, M.D. & Najmeh Vahid Lahiji |
| 7/2/2007-7/19/2007 | Tehran, Iran | Hossein Lahiji, M.D. |
| 6/1/2008-6/24/2008 | Tehran, Iran | Hossein Lahiji, M.D. & accompanied one-way by Najmeh Vahid Lahiji |
| 7/11/2008-8/3/2008 | Tehran, Iran | Hossein Lahiji, M.D. & accompanied on return trip by Najmeh Vahid Lahiji |
| 3/6/2009-3/16/2009 | Isfahan, Iran | Hossein Lahiji, M.D. |
| 6/26/2009-8/19/2009 | Isfahan, Iran | Hossein Lahiji, M.D. & Najmeh Vahid Lahiji |
| 6/12/2010-6/27/2010 | Isfahan, Iran | Hossein Lahiji, M.D. |
| 2/12/2011-2/24/2011 | Isfahan, Iran | Hossein Lahiji, M.D. |

44.     It was a further part of the scheme and artifice to defraud that **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji** did instruct their employees, who were only certified MA's or who held no license at all, to diagnose and treat Medicare and Medicaid beneficiaries and other private health insurance patients in his absence.

45.     It was a further part of the scheme and artifice to defraud that **Defendant Najmeh Vahid Lahiji** was, at times, present in the office on those days when **Defendant Hossein Lahiji, M.D.** was not present at the LUC.

46.     It was a further part of the scheme and artifice to defraud that **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji** would and did bill these health care benefit programs for patients treated by the unlicensed LUC employees and unqualified MA's employed by the LUC, as if **Defendant Hossein Lahiji, M.D.** had treated those patients himself, for example:

(a.) On or about January 10, 2006, **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji**, while traveling outside the United States, claimed that he treated patient D.M., when actually an unsupervised M.A. treated patient D.M.  The defendants billed using Medicare and Medicaid CPT codes, 99213 (office visit: 15 minutes face to face with patient-$150.00); 76857 (Echography of the Pelvic area, follow-up-$220); 53600 (Dilate Urethra Stricture, Male-$250); A4358 (Foley Catheter, 2 way, Latex-$25.00); and A4358 (Leg bag with or without tube-$15.00), as if **Defendant Hossein Lahiji, M.D.** treated the patient himself.

47.     It was a further part of the scheme and artifice to defraud that **Defendant Hossein Lahiji, M.D.**, would and did fail to actively participate and manage the course of treatment of urology services for persons for whom Medicare, Medicaid, and the private health insurance companies were being billed, and would and did fail to supervise the urology services that were being billed under his performing provider numbers, but provided by unsupervised MA's, for example:

(a.) **Defendant Hossein Lahiji, M.D.**, on or about January 18, 2006, failed to supervise the Trelstar 3 month injection for patient S.C., since he was traveling in Iran and failed to have any coverage by a physician partner, resident, substitute physician or "*locum tenens.*" Trelstar is a Food and Drug Administration ("F.D.A.") approved prescription chemotherapy injection drug used to treat prostate cancer. The F.D.A. requires that Trelstar must be administered under the supervision of a physician. **Defendant Hossein Lahiji, M.D.** did bill Medicare and Medicaid CPT code J3315 for $1,800.00.

48.    It was a further part of the scheme and artifice to defraud that **Defendant Hossein Lahiji, M.D.**, would and did sign "superbills" and medical records as if he had performed physician services when, in fact, he had not done so, for example:

(a.)   On or about September 17, 2004, **Defendant Hossein Lahiji, M.D.**, while traveling in Iran, claimed that he administered to patient J.D.F. a Lupron Depot injection, a chemotherapy drug used to treat prostate cancer, when in fact a M.A. administered the injection without any physician supervision. **Defendant Hossein Lahiji, M.D.** billed Medicare and Medicaid CPT code J9217 for $2,800.00 and CPT code 96400 for $90.00 and did sign the medical records for patient J.D.F. Lupron Depot is an F.D.A. approved prescription chemotherapy injection drug. The F.D.A. requires that Lupron Depot must be administered under the supervision of a physician.

49.    **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji** would and did hire and use MA's and untrained persons to administer "urology services" to the Medicare, Medicaid, and private health insurance beneficiaries at the LUC, thereby placing these patients at risk of physical danger.

50.     **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji** would and did bill and cause to be billed Medicare, Medicaid and private health insurance for urology services allegedly performed by **Defendant Hossein Lahiji, M.D.** when, in fact, **Defendant Hossein Lahiji, M.D.** was traveling outside the State of Texas and outside the United States, and the MA's were performing these "urology services" without any supervision from any physician in violation of protocols established by Medicaid, Medicare, private health insurance and the State of Texas.

*Upcoding*

51.     When **Defendant Hossein Lahiji, M.D.** was present at LUC, it was further part of the scheme and artifice to defraud, that there were specific days where **Defendant Hossein Lahiji, M.D.** claimed to treat between sixty-five (65) to one hundred seventeen (117) patients per day during the office hours of 7:00 a.m. to 6:00 p.m.

52.     **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji** submitted claims to Medicare, Medicaid and private health insurance, which they knew where false and fraudulent, in the defendants represented that:

(a.) **Defendant Hossein Lahiji, M.D.** had claimed he conducted a "consultation" or "office visit" for patients, when in fact he had overbilled Medicare, Medicaid and private health insurance for actual time he spent "face to face" with the patients, a practice known as "upcoding"; and

(b.) the patient's medical situation had necessitated the taking of a comprehensive medical history and a comprehensive physical examination by a physician, when in fact the

**Defendant Hossein Lahiji, M.D.** had not personally performed such a comprehensive exam nor taken such a comprehensive history (upcoding).

53.     It was further part of the scheme and artifice to defraud that **Defendant Hossein Lahiji, M.D.** regularly upcoded office visits and billed routine office visits as complex consultations to obtain higher reimbursement from Medicare, Medicaid and private health insurance than he was entitled to receive, for example:

(a)  On numerous occasions, including on or about December 30, 2009, **Defendant Hossein Lahiji, M.D.** would or did allegedly "treat" eighty (80) patients between the hours of 7:20 a.m. and 6:35 p.m., and did fraudulently submit bills using CPT codes for both office visits and consultations to Medicare, Medicaid and private insurance a total of 1,961 minutes or 32.6 hours.

*Additional Allegations*

54.     It was a further part of the scheme and artifice to defraud that, for billing purposes, in some instances, **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji** would and did disregard the actual medical condition of the patient and instead substitute a false diagnosis which qualified for payment by Medicare, Medicaid, and private health insurance.

55.     In addition, **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji** would and did bill Medicare and Medicaid for urology services which were never performed.  These fictitious billings were submitted in order to increase the payments from Medicare, Medicaid and private health insurance.

56.    **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji** would and did routinely bill Medicare, Medicaid and private insurance for urology services that were not medically necessary and for services not provided.

57.    **Defendant Hossein Lahiji, M.D.** and **Defendant Najmeh Vahid Lahiji** would and did falsely and fraudulently bill and cause to be falsely and fraudulently billed to Medicare, Medicaid and private health insurance claims totaling over $1.5 million dollars, by making false and fraudulent representations, including but not limited to, upcoding and billing for procedures while traveling outside of the United States, specifically in Iran and Saudi Arabia.

All in violation of Title 18, United States Code, Sections 1349, 1347 and 2.

## <u>COUNTS TWO AND THREE</u>
### (Health Care Fraud - 18 U.S.C. §§ 1347 and 2)

A.    <u>**INTRODUCTION**</u>

58.    The Grand Jury adopts, realleges, and incorporates herein the allegations in paragraphs 1 through 39 of the Introduction to Count One of this Indictment as if set out fully herein.

B.    <u>**THE SCHEME AND ARTIFICE**</u>

59.    In the Southern District of Texas, and within the jurisdiction of the Court,

**HOSSEIN LAHIJI, M.D.**
**and**
**NAJMEH VAHID LAHIJI,**

defendants herein, aided and abetted by each other and by others known and unknown to the Grand Jury, did knowingly and willfully execute and attempt to execute a scheme and artifice:

i.    to defraud a health care benefit programs, that is, Medicare, Medicaid, Aetna, Blue Cross Blue Shield, Humana, and United Healthcare.

16

ii.     to obtain, by means of false and fraudulent pretenses, representations, and

promises, any of the money and property owned by, and under the custody and

control of a health care benefit programs, that is, Medicare, Medicaid, Aetna, Blue

Cross Blue Shield, Humana, and United Healthcare;

in connection with the delivery of and payment for health care benefits, items and services,

namely, physician urology services.

## C.     MANNER AND MEANS OF THE SCHEME TO DEFRAUD

60.     The Grand Jury adopts, re-alleges, and incorporates herein the allegations in

paragraphs 41 through 57 of the Manner and Means of the Conspiracy in Count One of the

Indictment as if set out fully herein.

## D.     EXECUTION OF THE SCHEME TO DEFRAUD

61.     On or about the dates alleged in the counts below defendants,

**HOSSEIN LAHIJI, M.D.**
**and**
**NAJMEH VAHID LAHIJI,**

aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully

execute and attempt to execute a scheme and artifice:

i.     to defraud a health care benefit program; and

ii.     to obtain, by means of false and fraudulent pretenses, representations, and

promises, any of the money and property owned by, and under the custody and

control of a health care benefit program;

in connection with the delivery of and payment for health care benefits, items and services,

namely, by submitting and causing to be submitted false and fraudulent claims to Medicare and

17

Medicaid for physician urology services in connection with the diagnosis and treatment of patients in the amounts indicated below:

| Count | Patient Initials | Medicare Number | Medicaid Number | Claim Number(s) | Date of Service | CPT code | Amount Billed |
|-------|-----------------|----------------|-----------------|-----------------|-----------------|----------|---------------|
| 2. | A.P. | xxxxx6846 B | xxxxx1194 | (MC)2209189685810 (MD)200920544007211 | 07/01/2009 | 81003 J1580 J0696 96372 | $ 15.00 $ 50.00 $ 200.00 $ 90.00 $ 355.00 |
| 3. | C.T. | xxxxx9904 A | xxxxx6030 | (MC)2809293119630 (MD)200930872150352 | 07/28/2009 | 99211 81003 J1580 | $ 35.00 $ 15.00 $ 50.00 $ 100.00 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT FOUR
### (Conspiracy to Violate the Iranian Sanctions)

**A.**   **INTRODUCTION**

At all times relevant to the indictment,

62.   **Defendant Hossein Lahiji, M.D.** was a United States Citizen with a valid, Iranian passport, residing in the Southern District of Texas and elsewhere.

63.   **Defendant Najmeh Vahid Lahiji** was a Permanent Resident Alien of the United States and a citizen of Iran residing in the Southern District of Texas and elsewhere.

64.   The President of the United States, by virtue of the International Emergency Economic Powers Act (IEEPA) (50 U.S.C. Section 1705), is granted certain authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. On March 15, 1995, the President following previously issued Executive Orders, continued to declare a national emergency with respect to the Islamic Republic of Iran, finding the policies and actions of Iran constitute a threat to the national security of the United States due to Iran's support

of international terrorism and its attempts to acquire weapons of mass destruction.  On May 6, 1995, the President declared a trade embargo with Iran and prohibited the exportation of any goods, technology or services, with limited exception. Executive Order 12959.

65.   To implement the United States-Iran Embargo, the United States Department of Treasury through the Office of Foreign Assets Control (OFAC), issued the Iranian Transactions Regulations ("ITR")  (31 C.F.R. Part 560) in September 1995 (re-named the Iranian Transactions and Sanctions Regulations in 2012).  These regulations prohibit, with limited exception, the export of goods, technology and services from the United States to Iran unless authorized by OFAC.  The regulations further prohibit any transactions evading or avoiding the Iran Embargo, including the exportation of goods from the United States to a third country if the goods are intended for or destined to Iran unless authorized.  The regulations also prohibited any transaction involving goods or services of Iranian origin including new investment by a United States person in Iran or in property (including entities) owned or controlled by the Government of Iran unless authorized.  The national emergency with respect to Iran has been extended annually through successive presidential notices.

66.   Among other things, the ITR specifically provided the following:

(a)   31 C.F.R. § 560.203 prohibits "[a]ny transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part;"

(b)   31 C.F.R. §560.206(a) prohibits a United States person wherever located, from engaging "in any transaction or dealing in or related to (1) Goods or services of Iranian origin or owned or controlled by the Government of Iran; or (2) Goods, technology, or services for exportation, reexportation, sale, or supply, directly or

19

indirectly, to Iran or the Government of Iran." This regulation clarifies in 31 C.F.R. § 560.206(b) that "the term *transaction* or *dealing* includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating or guaranteeing;"

(c)    31 C.F.R. § 560.207 prohibits "any new investment by a United States person in Iran or in property (including entities) owned or controlled by the Government of Iran."

67.    A "hawala" was an alternative remittance system which transfers money (usually across borders) without physical or electronic transfer of funds. Money changers ("hawaladars") would receive cash in one country. Correspondent hawaladars in another country would dispense an identical amount (minus minimal fees and commissions) to a recipient or, less often, to a bank account.

68.    Neither **Defendants Hossein Lahiji, M.D. nor Najmeh Vahid Lahiji** ever applied for or obtained a license or authorization from OFAC to engage in transactions, investments or other activities in Iran or involving Iran.

**B.**    **THE AGREEMENT**

69.    From in or about June 2008 through and including in or about October 2008, in the Southern District of Texas and elsewhere, the defendants,

**HOSSEIN LAHIJI, M.D.**

**and**

**NAJMEH  VAHID LAHIJI**

knowing and wilfully conspired and agreed with others known and unknown to the grand jury, to violate IEEPA and the Iranian transactions regulations promulgated thereunder, as described

below, in violation of Title 50, United States Code, Section 1705 and Title 31, Code of Federal

Regulations, §§ 560.203, 560.206 and 560.207.

**C.     MANNER AND MEANS**

The manner and means used to accomplish the objects of the conspiracy included, among

others, the following:

70.     In order to conceal the true nature of their illegal activities and make it appear as if

they were not violating the Iranian sanctions, it was part of the conspiracy that the defendant

would and did send money and cause money to be sent from the United States to relatives located

in Iran or into bank accounts owned by the defendants located in Iran.  Once received in Iran,

money would be used for real estate investment purposes on behalf of the defendants **Hossein**

**Lahiji, MD and Najmeh Vahid.**

71.     It was part of the conspiracy that **Hossein Lahiji, M.D. and Najmeh Vahid**

**Lahiji** did transfer money to Iran utilizing an unlicensed money remitter business/hawala called

the Espadana Exchange to avoid the United States banking regulations and to make it appear that

they were not violating the United States' embargo with Iran.  It was a further part of the

conspiracy that **Hossein Lahiji and Najmeh Vahid Lahiji** would and did send money

representing profits of [their illegal fraud scheme described above] to Iran for the purpose of

making an investment on behalf of **Hossein Lahiji and Najmeh Vahid Lahiji** in real estate rental

property in Iran.

72.     It was a further part of the conspiracy that **Hossein Lahiji, M.D. and Najmeh**

**Vahid Lahiji** did communicate by telephone and email with an unlicensed, money remitter and

his partner in Isfahan, Iran in order to confirm when the Lahiji's monies were transferred to the

21

Espadana Exchanges's account in the United States.  Once received, the unlicensed money remitter's partner, who was located in Iran, would then transfer the equivalent amount of Iranian currency, less their fees, to either the Lahiji's relatives in Isfahan, Iran or into the Defendants' bank accounts in Iran, so the Defendants could conceal the true nature of their activities.

73.     It was further a part of the conspiracy that **Hossein Lahiji, M.D. and Najmeh Vahid Lahiji,** and others known and unknown to the grand jury, would and did perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purposes and objectives of and the acts done in furtherance of said conspiracy.

## D.     OVERT ACTS

74.     In furtherance of the conspiracy and to accomplish the goals, purposes and objectives of the conspiracy, **Hossein Lahiji, M.D. and Najmeh Vahid Lahiji,** and others known and unknown to the grand jury, committed and caused to be committed the following overt acts within the Southern District of Texas and elsewhere, which are described in substance below:

(a)     Records from the Espadana Exchange and bank records show transfers on the dates listed below from the Lahiji  Urology Center Account to the Espadana Exchange with the knowledge and the approval of **Najmeh Vahid Lahiji and Hossein Lahiji, M.D.**:

| | | |
|---|---|---|
| 6/23/08 | Fedwire from Lahiji Acct. XXX9171 | $100,000.00 |
| 7/01/08 | Fedwire from Lahiji Acct. XXX9171 | $150,000.00 |
| 7/01/08 | Fedwire from Lahiji Acct. XXX9171 | $150,000.00 |
| 7/07/08 | Fedwire from Lahiji Acct. XXX9171 | $200,000.00 |
| 7/07/08 | Fedwire from Lahiji Acct. XXX9171 | $200,000.00 |

| 7/15/08 | Fedwire from Lahiji Acct. XXX9171 | $ 50,000.00 |
| 7/15/08 | Fedwire from Lahiji Acct. XXX9171 | $ 85,000.00 |
| 9/30/08 | Fedwire from Lahiji Acct. XXX9171 | $100,000.00 |
| 9/30/08 | Fedwire from Lahiji Acct. XXX9171 | $100,000.00 |
| | Total | $1,135,000.00 |

(b)     On or about July 7, 2008, **Hossein Lahiji, M.D.**, signed two forms at Lone Star National Bank in McAllen, Texas entitled, "Authorization to Transfer Funds Outgoing Wire Transfer Request" whereby he authorized two wire transfers, each in the amount of $200,000 to the Espadana Exchange, LLC from the Lahiji Urology Center, PA account xxx9171.

(c)     On or about July 15, 2008, **Najmeh Vahid Lahiji** sent by facsimile to Lone Star National Bank in McAllen, Texas, a memorandum requesting two wire transfers from account XXX9171, one in the amount of $85,000 and the other for $50,000, be sent to the Espadana Exchange, LLC in Laguna Hills, California.

(d)     Shortly after each of the "Lahiji" wire transfers were received, the unlicensed money remitter did notify his partner in Isfahan, Iran to provide the defendants' relatives in Iran, the equivalent monies, less the unlicensed, money remitter's and his partner's fees, in Iranian Rials (IRR).

(e)     In or about July 2008, **Najmeh Vahid Lahiji** prepared a document titled "Mr. Vahid Books," which contained information about purchases of land and investments in Iran and provided in part "$500M of this money was placed in the bank and will be available on the 27th of this month." The document further references "Money Mr. Vahid owes Dr. Lahiji from other sources: $35,900,000"

23

and "Other proerties of Dr. Lahiji: Zeeyar and Sajadeeye."

(f)    In or about July 2008, **Najmeh Vahid Lahiji** further wrote in the document titled "Mr. Vahid Books," the following:

"Management Salary: Since we do need someone trustworthy to take care of matters here, do you think it is fair to start to pay a fair salary to my dad for his management of our money and property and other duties in Iran? ... I think it is not fair for him to do so much running around without getting paid since he does not use our money for himself....He has to take care of tenants now in our new home too as he has been doing so in Sajadeeye and giving us the money."

(g)    On or about March 10, 2009, **Hossein Lahiji, M.D. and Najmeh Vahid Lahiji** provided to their accountants in Houston, Texas a document entitled "Lahiji Urology Center Personal Balance Sheet."   The document shows that as of December 31, 2008, under the section "Other Current Assets" is listed the "Espadana Exchange LLC" with the amount  $1,135,000.00 noted next to it.

(h)    In or about June or July 2002, **Hossein Lahiji, M.D.** wrote a note in Farsi to Grand Ayatollah Hossein Mazaheri, who at that time was the head of the Isfahan Theological Institute in Iran, which references Grand Ayatollah Sistani and further states that he ["**Haj Hossein Lahiji**"] intends to make a long term investment in one of the Islamic Republic banks and was inquiring whether religious laws permit such a venture.  On the same piece of paper, in Farsi, but what appears to be different handwriting it states the following: "In the name of God, it is a great and sound....Hossein Mazaheri."

All in violation of Title 50 U.S.C. Section 1705 (a) and (c) and Title 31 C.F.R. Sections

560.203, 560.206 and 560.207.

## COUNTS FIVE AND SIX
### (31 U.S.C. Sections 5314 & 5322 - Failure to File Report of Foreign Bank and Financial Accounts)

75.     Paragraphs 62-63 and 70-74 of Count Four of this Superseding Indictment are realleged here.

76.     United States citizens and Permanent Resident Aliens have an obligation to report to the U.S. Internal Revenue Service ("IRS") on the Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether that individual had "a financial interest in, signature authority over, or other authority over, a financial account in a foreign country" in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained.  United States citizens and Permanent Resident Aliens have an obligation to report all income earned from foreign financial accounts on the tax return and to pay taxes due on that income.

77.     United States citizens and Permanent Resident Aliens who have an financial interest in, signature authority over, or other authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the Department of the Treasury a Report of Foreign and Financial Accounts, Form TD F 90-22.1 ("the FBAR").  An FBAR identifies, among other things, the name of the financial institution at which the account was held, account number, and the maximum value of the account during the calendar year.  The FBAR for the applicable year is due by June 30 of the following year.

78.     On or about November 27, 2006, **Najmeh Vahid Lahiji** sent a two (2)  page

25

facsimile transmittal to "Ahmad Iranshahee@ChildFoundation fax:011-98-21-88764771"; in which second page states the following:

      *        *        *

> "3. Other monies spent per Dr. Lahiji's request:
>   a.$67,000.00: Charity work approved in 2005
>   b.$350,000.00 placed in a joint account for a period of 5 years....
> Status as of 11/27/2006:
> 1. Tehran house due back 07/89
> 2. $350,000.00 due back 02/87...
> Please verify the above information.  Also, please show bank statements for the joint account."

79. On or about January 3, 2007, in response to a question from the Lahiji's accountant T.W., **Najmeh Vahid Lahiji** wrote the following email from her MSN email account:

> "The first three transactions, (245,500.00, 30,000.00, 25,700.00) are real estate we have purchased in Iran.  This is a business we have with my father for construction.  He buys property, builds, and then sells them.  We take 60% of the profit."

80. On or about July 15, 2008, an email in Farsi, signed by **Defendants Hossein Lahiji, M.D. and Najmeh Vahid Lahiji**, along with members of the operations board of the Child Foundation, Isfahan branch was sent to the email account "ah_iran@yahoo.com", stated in part the following:

> "According to decisions made on 87/3/31 [Corresponding to 06/20/2008] monies deposited on behalf of Mr. Doctor should be deposited in the form of a lump sum and within three days....the three hundred and fifty million which ius currently in the process of payment has a special contract which is completely separate from the Child Foundation accounts..."

81. In or about July 2008, **Najmeh Vahid Lahiji** prepared a document titled "Mr. Vahid Books," which contained a statement in section "B. Money Spent for Dr. Lahiji and Family by Mr. Vahid: $285,896,738," that states "Note: any expenses that were paid by dollars in 1385 and this year are not included in this list.  This list only includes items that were paid by monies in

the bank." Section "C. Other Monies sent by Dr. Lahiji: $926.1 M" describes purchases of a house and investments in Iran and provided in part "$500M of this money was placed in the bank and will be available on the 27th of this month." The document also states, "do you think it is fair to start to pay a fair salary to my dad for his management of our money and property and other duties in Iran? ... I do not know if we can find someone who will not steal and is trustworthy ...and take care of our money and properties here."

82.     In or about 2002 and 2003 and in or about 2007 and 2008, **Defendants Hossein Lahiji, M.D. and Najmeh Vahid Lahiji**, did complete an annual "Client Organizer" worksheet/questionnaire for their accountants located in Houston, Texas,  where they repeatedly checked the "No" box in response to the following questions:

a.      "Did you have any foreign income or pay any foreign taxes during the year?"

b.      "Were you a grantor or transferor for a foreign trust, have an interest in or a signature or other authority over a bank account, securities account, or other financial account in a foreign country?" and

c.      "Did you create or transfer money or property to a foreign trust?"

83.     On or about the dates listed below, in the Southern District of Texas, defendants,

**HOSSEIN LAHIJI, M.D.**
**and**
**NAJMEH VAHID LAHIJI**

while violating other laws of the United States, to wit, Health Care Fraud, in violation of 18 U.S.C. 1347, 1349 and illegal exports to Iran, in violation of the Iranian Sanctions,  50 U.S.C. 1705 (a) and (b) and Title 31 C.F.R. Sections 560.203, 560.206 and 560.207,  did unlawfully, knowingly and willfully fail to file with the Commissioner of the Internal Revenue Service, U.S. Department of the Treasury, a FBAR disclosing that both **Defendants Hossein Lahiji, M.D. and**

**Najmeh Vahid Lahiji**, had a financial interest in, signature authority over and other authority over, a bank, securities, and other financial account in a foreign country, specifically Iran, to wit, at least one financial account at the Bank of Karafarin and at least one account in the name of an individual, A.V.D., which said accounts during the calendar years listed below, exceeded $10,000 in aggregate value, each FBAR constituting a separate count of this indictment:

| Count | Year | Bank in Iran | Known High Balance (Estimated U.S. Dollar converted from Iranian Rials (IRR)) | Due Date of FBAR |
|-------|------|--------------|----------------|------------------|
| 5 | 2007 | Karafarin-Joint Account | $350,000 (US) | June 30, 2008 |
| 6 | 2008 | AVD's account/unknown & Karafarin-Joint Account | $ 542,829.23 (500 M Iranian Rials)[1] +$ 350,000.00 (US) ——————— $ 892,829.23 US | June 30, 2009 |

All in violation of Title 31, United States Code, Sections 5314 & 5322(a)-(b); and Title 31 Code of Federal Regulations, Sections 1010.350, 1010.306(c)-(d) &1010.840(b) (formally Title 31 Code of Federal Regulations, Sections 103.24, 103.27(c)-(d) & 103.59(b)).

**NOTICE OF FORFEITURE**
**(18 U.S.C. § 982(a)(7))**

84.    Pursuant to Title 18, United States Code, Section 982(a)(7), the United States gives notice to defendants,

---

[1] Estimated exchange rate for $1 USD=9.211 K Iranian Rials on July 28, 2008. *(Source: United States Federal Reserve Bank of New York.)*

**HOSSEIN LAHIJI, M.D.,**
**and**
**NAJMEH VAHID LAHIJI,**

that in the event of their conviction for any of the health care fraud violations charged in this

indictment, the United States intends to forfeit all property, real or personal, that constitutes or is

derived, directly or indirectly, from gross proceeds traceable to the commission of any such

offenses.

## NOTICE OF FORFEITURE
### (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

85.     Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United

States Code, Section 981(a)(1)(C), the United States gives notice to defendants,

**HOSSEIN LAHIJI, M.D.,**
**and**
**NAJMEH VAHID LAHIJI,**

that in the event of their conviction for the offense charged in Count Four, the United States

intends to forfeit all property, real or personal, that constitutes or is derived from proceeds

traceable to such offense.

## Money Judgment

86.     Defendants are notified that upon conviction, a money judgment may be imposed

equal to the total value of the property subject to forfeiture, for which the defendants may be

jointly and severally liable.

## Substitute Assets

87.     Defendants are notified that in the event that property subject to forfeiture, as a

result of any act or omission of defendants,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

29

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided without difficulty,

the United States will seek to forfeit any other property of the defendants up to the total value of

the property subject to forfeiture pursuant to Title 21, United States Code, Section 853(p), as

incorporated by reference in Title 28, United States Code, Section 2461(c) and Title 18, United

States Code, Section 982(b)(1).

A TRUE BILL

**ORIGINAL SIGNATURE ON FILE**

FOREPERSON

KENNETH MAGIDSON
UNITED STATES ATTORNEY

CAROLYN FERKO
ASSISTANT UNITED STATES ATTORNEY